*THE PIONEER MANUFACTURING COMPANY v. THE PHŒNIX ASSURANCE COMPANY OF LONDON.

*Contracts of Insurance—Stipulation to Arbitrate— Offer of Arbitration—Denial of Liability—Right af Action—Evidence— Judge's Charge.*

1. A provision in a policy of insurance, to the effect any differences arising as to the amount of loss or damage shall be submitted to arbitration at the written request of either party as a condition precedent to the right of action. is not against public policy, and will be upheld by the Courts.

2. Where it is in evidence that the adjuster of the insurance company offered the assured a certain sum in settlement of damages, which the assured declined, that constituted "a difference" within the meaning of the policy.

3. Under the provisions of the policy, it was not the duty of the defendant company to tender an agreement to arbitrate to the assured for execution until after a proposition to arbitrate had been acceded to.

4. Where it was in evidence that the defendant company, by its adjuster, wrote a letter to the assured, requesting that the damages "be ascertained by appraisement," and referring to a paper enclosed as "indicating an agreement for that purpose," which enclosed paper was a form of arbitration, signed by the defendant company and naming the arbitrator selected by it, with a blank to be filled with the name of the arbitrator selected by assured, and providing that the award should be "binding and conclusive as to the amount of such loss or damage, but shall not decide the liability of the insurance company": *Held,* that either the letter or the paper-writing constituted such a written request as the policy required, and that it was error for the Judge below to charge, in effect, that neither of them, taken separately, constituted such request.

5. If the assured refuses to accede to a proposition to arbitrate in accordance with the terms of the policy, and the insurance company thereafter denies any liability under the policy, no right of action accrues to the assured by reason of such denial.

---

* AVERY, J., and CLARK, J., did not sit in this case.

6. Upon the question as to whether or not there was a denial of liability by the insurance company, the latter is entitled to show all the circumstances under which the alleged denial was made. In such case, evidence is admissible that the assured refused to sign a printed form of submission to arbitration, giving as a reason that it contained a provision that the appraisers should not decide the liability of the company.

7. In such case, the defendant company was entitled to a specific instruction by the Court "that if the adjuster of the defendant company did not deny liability until after the plaintiff had refused to sign a submission to arbitration unless the clause providing that the appraisers should not decide the liability of the company should be stricken out, this was no excuse for the plaintiff's refusal to submit to appraisers, and such denial of liability was no waiver of the plaintiff's obligation to submit, upon a written request, to appraisal," and a refusal to give such instruction was error.

8. It is error to embody in one issue two propositions to which the jury may give different responses.

This was a CIVIL ACTION, tried before *Avery, J.,* and a jury, at August Term, 1888, of the Superior Court of WAKE County.

The plaintiff's action was based upon a policy of insurance issued by the defendant company, by which it contracted to insure against loss or damage by fire, certain property of the plaintiff described in the complaint. On, or about, the 20th day of October, 1886, all of said property was destroyed by fire except the engine and two boilers, &c., which, it is alleged, were greatly damaged. The defendant denied its liability on several grounds, which are illustrated by the issues. Much testimony was introduced. Seventy-six special instructions were requested by the defendant, and a large number of exceptions taken to the rulings of the Judge. Only so much of the case will be here stated as is necessary to a proper understanding of the opinion of the Court.

The issues upon which the questions considered upon appeal arose were as follows:

"8. Did a difference arise between plaintiff and defendant as to the extent of damage done by fire to the engine,

two boilers, inspirator and connections, not destroyed by fire? Ans. No.

"9. If so, did the defendant request of the plaintiff, in writing, in accordance with the requirements of the policy sued on, that the amount of damage to said articles should be assessed by appraisers, and did plaintiff refuse such request? Ans. No.

"10. Did the defendant company, at the time of making any request or demand for arbitration as to the damage to said articles of property not destroyed by fire, deny its liability to plaintiff under the said policy of insurance? Ans. Yes."

C. M. Hawkins testified as follows: "I had an interview with Mr. Warren and the other adjusters about October 29th, in my office on Fayetteville street. I think that Mr. Churchill, Mr. Dewey and Mr. Warren were present, and I believe that Mr. Cowper was present; it was October 29th, 30th, or November 1st or 2d; I believe it was November 2d, now. Mr. Warren came in with the others and handed me a paper, asking me to read and sign it; I thought I had the paper here, but do not find it among the papers that I have here.

"One morning before that, I went down to the place where the fire had taken place, with Warren; Warren and myself walked around the engine and two boilers from the outside without examining them. Mr. Warren said: 'We will give you $900 for damages to engine, two boilers, inspirator and connections.' I declined to take the offer. Mr. Warren made the offer on behalf of himself and his agents and adjusters of all the companies interested. I proposed to have competent persons or machinists to examine, and estimate the loss. Warren said that the only way to do that was to resort to arbitration. I told him that I had no objection to arbitration, if he would make it equally binding on me and all parties interested. I do not recollect what he said, but he and Mr. Churchill (and, I think, some other adjusters) left my office immediately after my reply to the remark

of Warren about arbitration. I next saw Warren that afternoon in my office; I think he came in about two or three o'clock, in company with Mr. Churchill, Mr. Dewey and Mr. Pulaski Cowper. Mr. Warren handed me a paper to read. I said I was willing to sign it if it bound the companies interested as it did my company—the plaintiff company. I told him what my objection to the paper was, and pointed out an objectionable clause. He struck that clause out and substituted another paper, and handed it to me; I said that the second paper was the same, but differently expressed; I said that it was the same old gray mare colored differently; my recollection is that the date was November 2d; it may have been October 29th. Mr. Warren said that if I did not sign that paper that they would not pay me anything. He was speaking for all the companies. I think that Mr. Churchill said to Mr. Warren, 'You at t as spokesman for all the companies.' I think that all the agents mentioned were present; I am not sure about young Mr. Walter Hay and Mr. Dewey. Pulaski Cowper was present. Mr. John Whitehead was present at that time. Mr. Warren walked across the floor and said, 'We don't owe you one dollar' (or one cent, perhaps, he said). I turned around and asked if he meant that they did not owe us anything. Mr. Warren said, 'Yes,' and we all then left the office.

"I did not refuse to sign either of those papers, but said that I would sign them if they should be made equally binding on the insurance companies interested as they were on me.

"I wrote * * * a letter to Yarborough House, as stated. There had been previously two or three other propositions submitted."

Plaintiff read, in evidence, a copy of the letter (exhibit D) written just after the adjusters left the office and referred to by the witness.

Mr. Hawkins continued: "The paper, exhibit E, was received by me after my letter, marked D, was written and

sent, and I referred in my letter to correspondence, letters and contracts tendered prior to November 3d. There were two papers purporting to be contracts tendered to me prior to November 3d.

"I cannot tell how many letters I received from Mr. Warren. I do not recollect that Mr. Warren submitted a printed form to me as contract of arbitration. I cannot identify the pencil memorandum."

Defendants here read exhibit E.

"I received the letter marked E late in the afternoon. I do not recollect having the paper that came with that letter, nor, if I had, what became of it. My impression is, that the letter was brought by a boy to me.

"I think that the exhibit F, and a pencil memorandum, contained all propositions submitted to me. I recollect no other. My objection to the proposition F was, that the company was not bound, while I was bound. My chief objection to the paper was, that Mr. Warren always wrote, and said in every conversation, that he waived nothing. Mr. Warren first said, 'I neither admit nor deny liability.' After that, and just before he left the office, he appeared to get angry, and said, 'We do not owe you one dollar' (or one cent, I am not certain which). All of the other appraisers signed an agreement that bound them as well as myself. It was not the stipulation asked for by Mr. Warren."

\*          \*          \*          \*          \*          \*

"The next interview was in Mr. Hawkins', on the morning of November 3d, when, pursuant to the appointment made the day before, we went to Mr. Hawkins' office. Mr. Churchill, Mr. Dewey and myself went together and submitted to Mr. Hawkins a form of agreement to be submitted to appraisers.

"There was a printed paper presented to myself as the special agent of the Phœnix Assurance Company of London, and subscribed by me for that company. I did not take it

after it was handed him. It was signed by Dewey and Churchill, as agents for their respective companies.

"That was the first proposition to arbitrate that was made. I do not know whether the paper was left in the hands of Hawkins, Dewey or Churchill. It was not brought by me out of the office. It is my best recollection that I last saw it in the hands of Mr. Hawkins. I cannot swear that it was left in his hands."

The defendants proposed, at this point, to prove contents of the papers which, they say, are different from exhibit "I," and insist upon their right to do so, because they served (as is admitted) a notice to produce them. The plaintiff produced the papers ("Q") in response to that notice. The Court held that there was not sufficient evidence; that the paper referred to by this witness was left in the hands of C. M. Hawkins for plaintiff company to allow proof of the contents. The defendants insisted upon their right because Mr. Hawkins said that he did not recollect that any printed form of arbitration was submitted to him, and that he did not have such paper, and that statement, in their view, makes notice unnecessary.

Upon a further question, made to counsel for plaintiff and to C. M. Hawkins for plaintiff, C. M. Hawkins answers that he has not now in his possession any paper, such as described in the notice.

Hawkins further testified that, according to the best of his recollection, he has never had any printed form in his possession filling the description in the paper marked "P."

After the foregoing testimony was offered, the defendant again proposed to prove the contents of the printed paper referred to by the witness, on the grounds already stated, and the further grounds that it is a collateral matter, and that it is not necessary to produce the paper, but the contents may be proven without notice to produce or account-

106—3

ing for loss of it. Objection sustained. Exception by defendant.

Defendant then proposed to show that C. M. Hawkins refused to sign the printed form of submission, stating to witness, as a reason, that it contained a provision that the appraisers should not decide the liability of the company.

Objection was sustained, and defendant excepted.

Witness then continued: "No other printed proposition was tendered except that one discussed, or written ones except those already discussed. We had a conversation about submitting to arbitration with Mr. Hawkins. We stated the terms of the proposition verbally to Mr. Hawkins, when he replied to us to reduce our proposition to writing, and we accordingly did reduce the proposition immediately to writing."

The defendant proposed to show what the witness and other adjusters verbally proposed as the terms of arbitration, and insisted upon their right to show this, as a part of a conversation in relation to which Hawkins testified; that they have a right to show the whole conversation.

The plaintiff objected on the ground that the witness had testified that the proposition was reduced to writing before Hawkins would consider it, and the writing is the highest evidence of what the proposition was, and that defendant cannot, as a part of a conversation, offer testimony incompetent, for this reason. Objection sustained. Exception by defendant.

"The interview was (considered as) interrupted after the printed paper was offered. The adjusters then retired; when they returned, Mr. Cowper came in, representing the Lancashire Company, and the pencil memorandum was then made.

"That paper (pencil memorandum) was made just after Mr. Cowper had asked Mr. Hawkins if he would sign a paper of a particular sort, describing it. Mr. Hawkins said that

he would not sign an agreement that had those concluding words in it, the concluding of the pencil memorandum. He added, that it was in substance what the former agreement was that he had refused to sign; that was all he did say then."

The counsel for defendant proposed to ask the witness whether that discussion was before or after the printed form was handed to Mr. Hawkins. Plaintiff objected on the ground that the printed form had been excluded, and the reference to it is made by counsel in order to prove its contents indirectly, and the testimony could not be material for any other purpose. The plaintiff did not object to the conversation, but to directing the attention of the witness and jury to the printed form. The plaintiff's objection sustained. Exception by defendant.

" The paper marked 'Q' was the paper referred to by Mr. Hawkins in his examination, when he said it was the same old gray mare of another color.

" When Mr. Hawkins said he would not sign an agreement containing the phraseology used in paper 'Q,' I told him that he had exhausted our efforts to secure an appraisement, except by demand in writing, and that he had driven us to that, but that we could make no written demand until after an effort to agree on the damage had failed, and a difference as to extent of loss had existed. This conversation was in relation to damage to engine, boilers, inspirator and connections. I then said to Mr. Hawkins that Mr. Churchill, Mr. Dewey and I would inspect the property, form the best opinion we could of the maximum extent of damage by fire to those articles, to-wit, engine, boilers, inspirator and connections, and inform him, so that if his judgment concurred with ours, we could avoid the necessity of an appraisement. Mr. Churchill, Mr. Dewey and myself did at once go to the ruins, and, relying on Mr. Dewey's judgment, agreed that the damage was seven or eight hundred dollars. This was

the afternoon of the third day of November—early in the afternoon. We came back and went to Mr. Hawkins' office, and I told him that we had concluded that the damage did not exceed eight hundred dollars to engine, two boilers, inspirator and connections. We asked him if he would agree that such was the extent of the damage to that property. He said that he had made up no judgment of his own, but would go and look, and let us know. He went out, and came back after an absence of perhaps half an hour, more or less, and gave it as his judgment that the engine, boilers, inspirator and connections mentioned had been made worthless by the fire. I thereupon said to him, 'Then you claim $3,000 or $4,000 as the damage?' He answered, 'Yes.' I then said to him, 'You won't accept our $800?' He said, 'No.' I said, 'We will not assent to your figures.' We did not agree. I then said to Mr. Hawkins, 'Now, here is a distinct difference between us.' Hawkins said, 'No, there is no difference.' I replied, 'If $800 is not one sum and $3,000 is not another, with a big difference, then I do not understand figures.' I then remarked that I now could do nothing more nor less than in writing to demand an appraisement of the articles mentioned. I thereupon wrote letter of November 3d, marked .exhibit 'E' (read to jury). While I was preparing a paper to submit with this letter, and had begun to prepare it, a part of exhibit 'Q,' Mr. Churchill and Mr. Dewey came into my room, and I, not liking the beginning of exhibit 'Q,' laid it aside. Mr. Churchill picked it up, and for himself, without any interest on the part of my company, continued it and finished it. I then and there prepared a paper, marked exhibit 'F,' and went to Mr. Hawkins' office with Mr. Churchill and Mr. Dewey, taking with me the papers marked 'E' and 'F.' Mr. Churchill or Mr. Dewey took paper marked 'Q.' I went up to Mr. Hawkins and handed him immediately the papers marked 'E' and 'F,' between three and five o'clock

on evening of the 3d of November. At the same time, exhibit 'Q' was handed to him. I said to Mr. Hawkins that, by the peculiar environments of the defendant company's policy, I could not recede from my former demand, that the form of appraisement should be in exact accord with the terms and conditions of the policy, and that he would find that the paper (exhibit 'F') submitted for his signature, clearly followed the exact phraseology of his policy, and I had intentionally so drawn it, determined to place my company on all of its rights, as he had refused to subscribe to other propositions in writing. I told him to examine his policy and see that the paper 'F' was in exact line with the wording of his policy, or, in substance, that.

"Mr. Hawkins stated that his policy was in his safe. I asked him if he would not get it, and repeated my request. He said that he was feeling very badly and would answer my demand next morning. I told him, if he proposed to refuse, that to compel me to remain another day would extremely embarrass my business, as I had been here three days and had demands on me from other places. He still declined then and there to examine the paper. I told him that I could not wait over and would leave that night. Messrs. Churchill, Dewey and myself then left Hawkins' office. Before we got a square away from his office, I decided to remain. On the morning of the 4th, Hawkins' letter of November 3d was handed to me and other adjusters. The letter was handed to such of the adjusters as were there. Mr. Dewey, Walter Hay, T. T. Hay, Churchill and Hutson Lee (who was another adjuster and arrived that day) and myself were present. I thereupon wrote my letter November 4th, marked exhibit 'K.' I referred in that letter to exhibit 'D,' to which it was an answer. I left that evening. I had no conference with Mr. Hawkins except in the presence of Mr. Churchill and Mr. Dewey. Mr. Cowper was

present at one of these interviews. Several times during November 3d, Mr. Hawkins directed questions to me, which forced me (in order to avoid misunderstandings), as I told him at the time, expressly to say that I would not commit my company to either an admission or denial of liability.

"At our last interview Mr. Hawkins said to me, 'Then, I understand you to say you owe me nothing?' I replied, 'No, sir; you misunderstand me; I repeat what I have heretofore told you, that I will not commit my company now to an admission or denial of liability.'"

The defendant excepted to the issue submitted by the Court—No. 10. The defendant also requested of the Court to amend the ninth issue, as settled by the Court, by striking out the words " refuse such request," and inserting in lieu thereof the words "fail or refuse to comply with such request," which was refused by the Court. The defendant also requested the Court to submit to the jury in a separate issue, *whether the plaintiff had failed or refused to comply with such request,* which was refused by the Court. To both of these refusals the defendant excepted.

Defendant also excepted to refusal of the Court, on the subsequent request to divide issue, now numbered nine, so as to submit separately, requested, whether plaintiff "failed" and whether he "refused," on a proper request, furnished proof, or to insert the word "fail" before the word "refuse," in said issue.

There was much other testimony corroborative and contradictory of the chief witnesses, the material parts of whose evidence has been set out.

The policy of insurance contained the following stipulation and agreement:

## EXHIBIT A.

When property is damaged, the assured shall forthwith cause it to be put in order, assorting and arranging the

various articles according to their kinds, separating the damaged from the undamaged, and shall cause an inventory to be made and furnished the company of the whole, naming the quantity, quality and cost of each article. The amount of sound value, and of the loss or damage, shall be determined by agreement between the company and the assured; but if, at any time, differences shall arise as to the amount of loss or damage, or as to any question, matter or thing concerning or arising out of this insurance, every such difference shall, at the written request of either party, be submitted, at an equal expense to each of the parties, to two competent and impartial persons—one to be chosen by each party—and the two so chosen shall select an umpire to act with them in case of their disagreement: *Provided, however,* that none of the persons so chosen shall be interested in the loss as creditors, or otherwise, or related to the assured or sufferers; and the award, in writing, of any two of said persons shall be binding and conclusive as to the amount of such loss or damage, or as to any question, matter or thing so submitted, but shall not decide the liability of this company.

EXHIBIT D.

NOVEMBER 3d, 1886.

*Messrs. L. R. Warren and others:*

GENTLEMEN: Referring to the correspondence between the agents and adjusters of the several insurance companies whose policies I hold for insurance upon the property of the Pioneer Manufacturing Company, I beg to state that I have furnished everything with regard to the loss of the Pioneer Manufacturing Company, occasioned by the fire on October 20th, 1886, which you have required, as far as it was in my power to do, and I have also expressed my willingness to furnish you with any other proof or give you any other information which could be furnished or given. I have also

submitted to you the vouchers in support of the company's claim for loss, and I have also proposed that we should take up the said company's claim for loss, and go over it, item by item, to the end that if any item is objected to by you, you may specify the ground of objection in order that the same may be removed or adjusted conformably to the terms and conditions of your respective policies of insurance. I understand you do not accede to the proposition, but, on the contrary, you have declared that you do not recognize or admit the fact that your said companies are liable to one dollar of loss on account of said policies

It is, therefore, only left to me to request you to furnish your blanks, upon which I may duly make out and forward to you the proof of loss of said Pioneer Manufacturing Company, as required by said several policies of insurance.

Yours very truly,

C. M. HAWKINS,
*President.*

EXHIBIT E.

RALEIGH, N. C., November 3, 1886.

*Pioneer Manufacturing Company, Colin M. Hawkins, President, Raleigh, N. C.:*

DEAR SIRS: A difference existing between us as to the extent of the damage by fire (October 20, 1886) to property covered by the second item of our policy, viz.: engine and two boilers, including inspirator and connections, we hereby request that said damage be ascertained by appraisement, in accordance with the terms and conditions of our said policy, and to that end submit herewith, executed by us, a paper indicating an agreement for that purpose, which we beg you will sign, first filling in the name of the party selected by you as appraiser.

Yours very truly,

PHŒNIX ASSURANCE CO. OF LONDON,

L. R. WARREN, *Special Agent,*

## EXHIBIT F.

A difference existing between Pioneer Manufacturing Company and Phœnix Assurance Company of London, as to the extent of the loss by fire on October 20, 1886, on engine and two boilers, including inspirator and connections, in engine room attached to main building of said Pioneer Manufacturing Company; and said Assurance Company having, in writing, requested that an appraisement of such loss or damage be had in accordance with the terms and conditions of said Insurance Company's policy on said property, it is hereby agreed by and between said parties that B. R. Harding and _____, one of whom is chosen by said Manufacturing Company and the other by said Insurance Company, and neither of whom is interested in said loss as creditors, or otherwise, nor related to assured or sufferers, shall estimate and appraise at the true cash value what such loss or damage by said fire to said property is. The two persons so chosen shall select an umpire to act for them in case of their disagreement, but such person so chosen shall not be one who is interested in the loss, or creditor, or otherwise, nor related to assured or sufferers. The said appraisement shall be at an equal expense to the parties hereto. The award, in writing, of any two of said persons so selected shall be binding and conclusive as to the amount of such loss or damage, but shall not decide the liability of said Insurance Company. Witness the following signature and seals:

PHŒNIX ASSURANCE CO. OF LONDON, [Seal.]
By L. R. WARREN, *Adjuster*. [Seal.]

## EXHIBIT I.

It is agreed by and between the Pioneer Manufacturing Company, of the one part, and the insurance companies whose names are hereto subscribed, of the other part, that

B. R. Harding and _____, who are mutually selected by the parties hereto for that purpose only, shall estimate and appraise, at true cash value, the actual damage occasioned by fire on 20th October, 1886, to the engine and two boilers, including inspirator and connections in engine-room attached to main building, the property of said Pioneer Manufacturing Company. The powers of said appraisers are hereby expressly declared to be within the terms and purposes herein expressed, and their award, in writing, within the terms and purposes of this agreement shall be held as fixing the quantum of such damage, and, as such, binding on the parties hereto. This agreement waives no right of said companies, or of assured, under the terms and conditions of their policies, except that neither party hereto shall deny the award of said appraisers to be the true and actual measure of damage, on a cash basis, to the property hereby submitted for appraisal.

(Signed)     J. D. W. CHURCHILL,
For L. & L. G. Ins. Co.
SOUTHERN INS. CO. OF. N. O.
By L. R. Warren, Adj'r.
GERMAN-AMERICAN INS. CO.
By Geo. W. Dewey, S. A.

EXHIBIT Q.

Shall estimate and say what is the actual damage of fire to, &c., and when, in writing, they shall have said what, in their judgment, such damage is, the sum so found shall be deemed, between the parties hereto, to be the actual damage to said property by such fire, but said appraisers shall have no other power than is herein stated, it being understood that their finding shall in no wise decide that any company hereto is, or is not, liable.

The defendant, among other instructions, asked the Court to charge as follows:

"17. That, according to the plaintiff's testimony, a difference arose between the plaintiff and the defendant as to the amount of loss or damage on the engine, boilers, inspirator and connections.

"34. That if Hawkins refused to sign the appraisal paper marked 'F,' on the ground that it did not bind both parties equally, this was not a good ground for such refusal, as that paper, in law, did bind both parties equally, and he ought, upon written request, to have signed it, unless it was duly waived, and his failure to so sign, for this reason, amounted to a refusal to sign.

"40. That if the adjuster of the defendant company did not deny liability until after the plaintiff had refused to sign a submission to arbitration unless the clause providing that the appraisers should not decide the liability of the company, should be stricken out, this was no excuse for the plaintiff's refusal to submit to appraisers, and such denial of liability was no waiver of the plaintiff's obligation to submit, upon a written request, to appraisal.

"53. That if the denial of liability was made by the defendant after the plaintiff had refused to sign the arbitration paper 'F,' or, after being duly requested, the plaintiff refused to enter into an appraisal, such denial of liability was no excuse for the refusal to enter into the appraisement, and the said denial was no waiver of the right to demand the appraisal or arbitration.

"54. That to have the effect of a waiver of appraisal, the denial of liability of the company must precede the refusal to appraisal or arbitration.

"76. That the paper containing the submission to appraisal was in accordance with the terms of the policy, and as to the only point contained in it, the fixing of the value, was

equally binding upon both parties; that this provision of the policy was binding and legal, and the plaintiff was bound, under the policy, to accede to that or a similar appraisal."

The Court, after charging the jury, said that the instructions given were in lieu of those asked.

The instructions given are in part a compliance with said requests by stating the same propositions in different language, and where there is no such compliance, it is intended as a refusal without marking each request as given or refused. Some of said requests are mere recapitulations of the testimony, and so far as they are correct recitals of the evidence are complied with in the recapitulation of the testimony by the Court.

Upon the questions arising upon the foregoing prayers for instruction, the Court charged—

8. If the defendant's adjuster, Warren, acting on behalf of defendant company, offered to adjust the loss on a basis of valuation of engine, two boilers, inspirator and connections, not destroyed by fire, at either $750, $800 or $900, or any other definite sum, and the plaintiff company, through its president, C. M. Hawkins, refused to accept said offer, and settled on said basis, then a difference did arise, and the jury would so find Yes to the 8th issue. The burden is on the defendant to establish the affirmative of this issue.

9. If, after such difference had arisen, the defendant's adjuster, L. R. Warren, sent to C. M. Hawkins the letter marked Exhibit E, and sent also accompanying said letter a paper marked Exhibit F, or a copy of said paper signed by said Warren, as it purported to be, then the plaintiff did request, in writing, according to the requirement of the policy, that the damage should be assessed by appraisers. If such request was made and refused, the jury would respond to the 9th issue Yes. But if said request in writing

marked F, was not delivered to C. M. Hawkins, and no request was handed to Hawkins other than that marked exhibit I, which is not signed by Warren as an adjuster of the defendant, then no request in writing was made, and the jury would respond to the 9th issue No.

10. If L. R. Warren, the adjuster of the defendant company, declared to C. M. Hawkins, president of the plaintiff company, in the office of the latter, without qualification, that he would not for his company, or his company would not, pay one dollar or one cent for loss by reason of the fire, and walked immediately out of the said office, then such declaration was a denial of 'liability on the part of the defendant, and the jury would respond to the 10th issue Yes. If the said Warren did not make said unqualified declaration, or if said Warren said only that he neither admitted nor denied liability, then there was no denial, and the jury would respond No to the 10th issue.

11. If the said L. R. Warren wrote and caused to be delivered to said C. M. Hawkins the letter put in evidence and marked " K," then the jury will respond Yes to the 11th issue. I believe it is admitted that the letter was sent and received.

13. If the defendant's adjuster (Warren) declared, without qualifications, to said C. M. Hawkins, in the office of the latter, that his company—meaning defendant company, or he, for the defendant company—would not pay one dollar or one cent of loss to plaintiff on account of loss by the fire, and immediately left said office, then such declaration was denial of liability.

There was a verdict for the plaintiff on the issues, whereupon the defendant moved the Court for a new trial.

Judgment was rendered in favor of the plaintiff, from which the defendant appealed.

*Messrs. T. C. Fuller, Spier Whitaker* and *E. C. Smith,* for the plaintiff.

*Messrs. J. W. Hinsdale, C. M. Busbee* and *F. H. Busbee,* for the defendant.

SHEPHERD, J.: The defendant relies upon several defences, but the only one necessary to be considered in order to dispose of this appeal is founded upon the following clause in the policy of insurance, which is the basis of this action:

"The amount of sound value, and of the loss or damage, shall be determined by agreement between the company and the assured, but if, at any time, differences shall arise as to the amount of loss or damage,   *   *   *   every such difference shall, at the written request of either party, be submitted, at an equal expense to each of the parties, to two competent and impartial persons—one to be chosen by each party—and the two so chosen shall select an umpire to act with them in case of their disagreement,   *   *   *   and the award, in writing, of any two of said persons shall be binding and conclusive as to the amount of such loss or damage, or as to any question, matter or thing so submitted, but shall not decide the liability of the company.   *   *   *   It is furthermore hereby expressly provided and mutually agreed that no suit or action against this company for the recovery of any claim by virtue of this policy shall be sustainable in any Court of law or chancery until after an award shall have been obtained, fixing the amount of the claim in the manner above provided.   *   *   *   And it is hereby understood and agreed by and between the Phœnix Assurance Company of London and the assured that this policy is made and accepted with reference to the foregoing terms and conditions."

It is, we think, well settled that such a provision in a contract of insurance is not against public policy, and that it will be upheld by the Courts, in so far as it provides for the

submission to arbitration of the amount of loss or damage sustained by the assured.

A policy of insurance, precisely similar to the one under consideration, was declared to be valid by the Supreme Court of New Jersey, in the case of *L. L. & G Insurance Co.* v. *Wolff*, 17 Ins. Law Journal, 714; 14 Atlantic R., 561, and this decision is abundantly sustained by the highest authority.

"Agreements for determining only the amount to be recovered by arbitration are valid, and the determination by arbitration of the amount of damages to be recovered, or the time of payment, may lawfully be made a condition precedent." *Scott* v. *Avery*, 5 Ho. of Lords Cases, 811; 2 Addison Contracts, 294; Morse on Arbitration and Awards, 93; May on Insurance, 493; *Perkins* v. *U. S. Electric Light Co.*, 16 Fed. Rep., 513; *Gauche* v. *London & Lancashire Ins. Co.*, 1 Fed. Rep., 347; *Carroll* v. *G. F. Ins Co.*, 13 Pac. Rep. (Cal.), 863.

In *Russell* v. *Pellegrini*, 38 E. L. & E., 101, Lord Campbell said: "When a cause of action has arisen, the Courts cannot be ousted of their jurisdiction," but added that "parties may come to an agreement that there shall be no cause of action until their differences have been referred to arbitration."

"Both sides admit that it is not unlawful for parties to agree to impose a condition precedent, with respect to the mode of settling the amount of damage, or the time of paying it, or any matters of that kind, which do not go to the root of the action. On the other hand, it is conceded that any agreement which is to prevent the suffering party from coming into a Court of law—or, in other words, which ousts the Courts of their jurisdiction—cannot be supported." *Edwards* v. *The Aberayron Mutual Ship Ins. Co.* (limited), 1 Q. B. Div., 593 (1875).

"I take the law as settled by the highest authority—the House of Lords—to be this: There are two cases where such a plea as the present is successful—first, where the action

can only be brought for the sum named by the arbitrator; secondly, where it is agreed that no action shall be brought till there has been an arbitration, or that arbitration shall be a condition precedent to the right of action." *Dawson* v. *Fitzgerald,* 1 Exchequer Div., 260 (1876).

"Since the case of *Scott* v. *Avery,* in the House of Lords, the contention that such a clause is bad, as an attempt to oust the Courts of jurisdiction, may be passed by."

See also Porter's Laws of Insurance, 210, and *Casser* v. *Sun Fire Office* (Supreme Court Minn., 1890), Insurance L. J.

The contention of the defendant company is, that a difference arose as to the amount of damage to the engine, boilers, &c., that the defendant made a written request of the plaintiff that the said difference should be submitted to, and determined by, arbitrators, and in accordance with the terms of the policy, and that the plaintiff, without legal excuse, refused to comply with said request.

The submission to arbitration upon the written request of the defendant, being clearly a condition precedent to the right of action, we are now to determine whether the defendant company has placed itself in such a position as to defeat the present action by reason of the non-performance of the said condition by the plaintiff.

1. As a first step in the establishment of this defence, it was incumbent on the defendant to show that a difference, in respect to the particulars mentioned, had arisen, and, in order to determine this question, the eighth issue was submitted to the jury.

The defendant requested his Honor to charge the jury that, according to the plaintiff's own testimony, through its president, Hawkins, such a difference had arisen between the parties.

The Court declined to give this instruction, and the jury found the said issue in the negative.

Hawkins testified that L. R. Warren, the adjuster of the defendant company, offered him nine hundred dollars in settlement of the damages to the above mentioned property, and that he, Hawkins, declined to accept the said offer. This surely constituted a "difference," within the meaning of the word as used in the policy, and the subsequent negotiations as to arbitration must have been based entirely upon the assumption that such a difference existed.

We are, therefore, of the opinion that his Honor erred in declining to give the instruction prayed for, and we presume that he only permitted the finding of the jury to stand, upon the ground that it became immaterial in view of the verdict upon the succeeding issue.

2. This, the ninth issue, involves the second branch of the inquiry, and is in the following words:

"If so (that is, if there was a difference), did the defendant request the plaintiff, in writing, in accordance with the requirement of the policy sued on, that the amount of damage to said articles should be assessed by appraisers, and did the plaintiff refuse such request"?

The defendant tendered two issues, which divided the proposition contained in that which was submitted by the Court. These issues were refused, and the defendant excepted to such refusal, and also to the issue actually submitted. This exception finds direct support in *Emry* v. *Railroad*, 102 N. C., 209, where it is said that "it is misleading to embody in one issue two propositions, as to which the jury might give different responses, and, on exception taken in apt time, a new trial will, in such cases, be granted."

We prefer, however, to base our decision upon grounds which more closely affect the merits of the defence, and we will, therefore, inquire whether there was error in the instruction of the Court upon the said issue.

Hawkins testified that he received the letter (exhibit "E") from Warren, the adjuster of the defendant company, on

the 3d of November, and that before he had written his letter (exhibit " D "), which was dated on the same day, Mr. Warren had handed him exhibit " F," which, he admits, was a proposition tendered to him by the said Warren. Mr. Hawkins further says: " I think that the exhibit ' F ' and a pencil memorandum contained all the propositions submitted to me. * * * . My objection to the proposition ' F ' was that the company was not bound, while I was bound."

Now, proposition " F " was a paper drawn in strict conformity to the provisions of the policy, and it provided that the award should be " binding and conclusive as to the amount of such loss or damage, but shall not decide the liability of said insurance company." Not only was it executed by the defendant company, but it contained the name of the arbitrator selected by it, and was complete in every respect, save its execution by the plaintiff company and the insertion of the name of the arbitrator to be selected by it. The policy does not require any particular form of written request, and we can conceive of no stronger one than this paper which the plaintiff admitted was submitted to him.

Again, the plaintiff admitted that he received letter "E." This was a formal request for an arbitration or appraisement, and it referred to "a paper indicating an agreement for that purpose," and executed by the defendant, which the plaintiff was requested to sign. Hawkins does not deny that he received the enclosure; but if he did not receive it, the letter was none the less a written request to arbitrate according to " terms and conditions" of the policy. If the paper enclosed was not drawn in accordance with such terms and conditions, it was the duty of the plaintiff to have made it known, so that a proper agreement could have been prepared. Besides, it was not the duty of the defendant to tender the agreement until after the proposition had been acceded to, and it will be further observed that the letter did not request a submission to arbitration according to the

terms of the policy as interpreted by the enclosed ·paper, but that the submission to arbitration was to be in accordance with the terms of the policy, and the paper was submitted only as " indicating an agreement" to effectuate that purpose.

The Court charged the jury upon the said issue as follows:

" 9. If, after such difference had arisen, the defendant's adjuster, L. R. Warren, sent to C. M. Hawkins the letter marked exhibit ' E,' and sent also accompanying said letter a paper marked exhibit ' F,' or a copy of said paper signed by said Warren, as it purported to be, then the plaintiff did request in writing, according to the requirement of the policy, that the damage should be assessed by appraisers. If such request was made and refused, the jury would respond to the 9th issue Yes. But if said request in writing, marked ' F,' was not delivered to C. M. Hawkins, and no request was handed to Hawkins other than that marked exhibit ' I,' which is not signed by Warren as an adjuster of the defendant, then no request in writing was made, and the jury would respond to the 9th issue No."

This instruction is to the effect that neither exhibit 'E' nor ' F,' taken separately, would constitute such a written request as is required by the policy, whereas we have seen that either paper would be sufficient.

This error is not cured in the latter part of the instruction, which speaks of the delivery to plaintiff of the " request in writing, marked ' F.' "    If such paper was, in the opinion of his Honor, a request in writing, he should have instructed the jury, as substantially requested, that the plaintiff's president, Mr. Hawkins, expressly admitted that the said paper was submitted to him, and that he had failed to agree to it. Again, if his Honor considered the paper 'F' a written request, he should have so stated, and put it affirmatively, as well as negatively, to the jury ; but we very much doubt that, even had he done so, the prejudicial effect of the first part of the. instruction would have been removed.

3. We will now consider the exception relating to the tenth issue, which is as follows: "Did the defendant company, at the time of making any request or demand for arbitration as to the damage to said articles of property not destroyed by fire, deny its liability to plaintiff under the said policy of insurance"?

Hawkins testified that at an interview in his office (Messrs. Churchill, Dewey and Cowper being present), Warren handed him a paper to read; that he told Warren that he was willing to sign it if it bound the insurance companies as it did the plaintiff company, and that he pointed out an objectionable clause; that Warren struck out that clause and substituted another paper and handed it to him; that he, Hawkins, said that it was "the same old gray mare colored differently;" that Warren said that if he, Hawkins, did not sign that paper they would pay him nothing. "He was speaking (says Hawkins) for all the companies. I think Mr. Churchill said to Mr. Warren, 'You act as spokesman for all the companies.' I think that all of the agents were present; I am not sure about young Mr. Walter Hay and Mr. Dewey. Pulaski Cowper was present. Mr. John Whitehead was present at that time. Mr. Warren walked across the floor and said, 'We don't owe you one dollar' (or one cent, perhaps, he said). I turned around and asked if he meant that they did not owe us anything. Mr. Warren said, 'Yes,' and we all then left the office."

The plaintiff also introduced upon this point John J. Whitehead, who testified as follows: "I am employed by the Gas Light Company, of which Mr. Hawkins is president. I was in Mr. Hawkins' office about November 1, 1886, and saw Mr. Warren and Mr. Churchill, and, I think, Mr. Dewey was there. They submitted a paper to Mr. Hawkins to sign. He said that it bound him, but did not bind the companies. Then Mr. Warren sat down and wrote with a pencil and handed what he wrote to Mr. Hawkins. Mr.

Hawkins said, in substance, that it amounted to the same thing as the other. Mr. Warren got up off the stool and said to Mr. Hawkins, 'Then, Mr. Hawkins, I don't owe you one cent.' Mr. Hawkins turned to him and said, 'Do I take that as a denial of liability?' Mr. Warren said, 'Mr. Hawkins, I wish you to understand that we do not admit one cent of liability.' I don't recollect anything more, except that in a very short time they left."

The foregoing testimony was relied upon to establish the alleged denial of liability by the defendant, and it is plain that the latter was entitled to show all of the circumstances under which the alleged denial was made. Hawkins admits that two propositions to arbitrate were made at the said interview. Now, if these propositions were in accordance with the terms of the policy, and the plaintiff refused to accede to them, the very terms of the contract forbade a recovery, and Warren would have been justified in making the imputed denial

It was in evidence that Warren presented a printed form of an agreement to submit to arbitration, executed by the defendant and the other companies (which, according to Hawkins' testimony, may have been exhibit "F," or a similar paper), and the defendant proposed to show its contents by oral testimony, having given notice to the plaintiff to produce it. Passing by the ruling of the Court that the contents could not be thus proven for any purpose, which ruling is, to say the least, doubtful, it is very plain to us that the defendant had a right to show by the witness Warren that Hawkins "refused to sign the printed form of submission, stating to witness as a reason that it contained a provision that the appraisers should not decide the liability of the company." His Honor excluded this testimony, which expressly stated the ground of refusal, and in this we think there was serious error, although there was other testimony from which the same facts might probably have been

inferred. It will be noted that Hawkins admits that the
paper was a proposition in the form of an agreement to
arbitrate, and it was unnecessary to have shown its contents,
so far as the question of denial of liability was concerned,
if the refusal to accept was based upon the reason alleged to
have been assigned by him. The whole conversation, there-
fore, should have been submitted to the jury for the purpose
of showing why the alleged denial was made.

Apart from this, however, the material contents of the
papers were proved, without objection, in another way. Mr.
Hawkins speaks of a substituted paper ("the same old gray
mare," &c.) being submitted to him. Warren testified that
the paper marked "Q" was the one so described by Hawkins.
This paper was in evidence, and its terms are in perfect con-
formity to the provisions of the policy. If, then, as Mr.
Hawkins says, these terms were the same as those in the
other paper, which Warren states was executed by him and
the agents of the other companies, we have in evidence the
very clause which Hawkins objected to. There was, there-
fore, testimony tending to prove that a proper agreement to
arbitrate, executed by the defendant, was proposed to the
plaintiff, and that this request in writing was not acceded to.
It was also in evidence that Hawkins said he would not sign
any agreement that contained the alleged objectionable pro-
vision. Now, if this testimony be true, Warren, as we have
remarked, was justified in making the alleged denial, and
the defendant had the right to have this view particularly
presented to the jury. To this end, it very properly asked
the following instruction: "That if the adjuster of the
defendant company did not deny liability until after the
plaintiff had refused to sign a submission to arbitration
unless the clause providing that the appraisers should not
decide the liability of the company should be stricken out,
this was no excuse for the plaintiff's refusal to submit to
appraisers, and such denial of liability was no waiver of the

plaintiff's obligation to submit, upon a written request, to appraisal."

His Honor instructed the jury as follows: "If L. R. Warren, the adjuster of the defendant company, declared to C. M. Hawkins, president of the plaintiff company, in the office of the latter, without qualification, that he would not for his company, or his company would not, pay one dollar or one cent for loss by reason of the fire, and walked immediately out of the said office, then such declaration was a denial of liability on the part of the defendant, and the jury would respond to the tenth issue Yes. If the said Warren did not make said unqualified declaration, or if said Warren said only that he neither admitted nor denied liability, then there was no denial, and the jury would respond No to the tenth issue."

The denial mentioned in the issue, in view of the pleadings and evidence, must necessarily mean a wrongful denial. If it was not wrongful, it was no denial, in the legal meaning of the word, as thus used. The instruction prayed for involved, therefore, a delicate question of waiver, which it was very material to the defendant to have clearly and specifically presented to the jury. The instruction given entirely ignores this theory of the defence, and seems predicated upon the idea that the testimony of Hawkins and Whitehead, the only witnesses to the denial, was either that there was an unqualified denial, or a refusal either to deny or admit liability. These are the two views presented by the charge, whereas it might very reasonably have been inferred from the testimony of the said witnesses, and especially that of Whitehead, that the alleged denial was in consequence of the refusal of the tendered propositions. In other words, the finding of the issue was made to turn rather upon the nature of the denial than the right of the defendant, under the circumstances, to make any denial whatever.

We conclude, therefore, that there was error in declining to give the special instruction prayed for by the defendant, and that for this, and other errors which we have indicated, there should· be a new trial.    Entertaining these views, we deem it unnecessary to pursue the discussion through the labyrinth of exceptions which fill this very voluminous record.

*Venire de novo.*